# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2011

(Submitted: May 21, 2012      Decided: August 14, 2014)

Docket Nos. 11-922-pr(L), 11-972-pr(XAP)

_____

SHAWN A. JACKSON,

*Petitioner-Appellee-Cross-Appellant*,

- v. -

JAMES T. CONWAY, Superintendent, Attica Correctional Facility,

*Respondent-Appellant-Cross-Appellee.*

_____

Before:

    PARKER, HALL, and WALLACE,* *Circuit Judges.*

Appeals from the February 28, 2011 amended judgment of the United States District Court for the Western District of New York (Bianchini, *M.J.*) granting in part the petitioner's habeas corpus application. Respondent appeals from so much of the judgment as granted petitioner's application for a writ of habeas corpus and ordered his convictions conditionally vacated. Petitioner cross-appeals that portion of the judgment as denied his other grounds for habeas relief. We hold that although the district court correctly determined that the state court's rejection of Petitioner's *Miranda* claim was an "unreasonable application" of clearly established Supreme Court precedent, it failed to afford the state court's rejection of Petitioner's prosecutorial misconduct and ineffective assistance of counsel claims the proper deference it was entitled under the Antiterrorism and Effective Death Penalty Act.

AFFIRMED in part; REVERSED in part.

_____

* The Honorable J. Clifford Wallace, United States Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

BRIAN SHIFFRIN, Easton Thompson Kasperek Shiffrin, LLP, Rochester, NY, *for Petitioner-Appellee-Cross-Appellant Shawn A. Jackson.*

LESLIE SWIFT, Senior Assistant District Attorney, *for* Michael C. Green, Monroe County District Attorney, Rochester, NY, *for Respondent-Appellant-Cross-Appellee James T. Conway.*

HALL, *Circuit Judge*:

## BACKGROUND

In the pre-dawn hours of November 30, 2000, officers of the Town of Greece Police Department responded to a 911 call placed from Shawn A. Jackson's ("Jackson's") residence. Jackson's wife, Rebecca Jackson ("Rebecca"), met the officers on arrival and, upon entering the house, the officers encountered Jackson's ex-wife, Karen Jackson ("Karen"), and his fourteen-year-old daughter, "CJ." The three visibly upset women told the officers that Jackson had raped them each multiple times over the course of the evening and early morning. The officers woke Jackson, who was asleep on the living room couch, and transported him to police headquarters. Karen and CJ went to Rochester General Hospital for medical evaluations. From the house, the officers collected potential physical evidence, including sheets from the living room floor and from Jackson's bed.

At police headquarters, Sergeant Christopher Bittner interviewed Jackson at approximately 6:45 that morning. The sergeant initially told Jackson he was not under arrest but then formally arrested him when Jackson sought to leave the interview room. After being informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), Jackson invoked his right to remain silent and refused to speak with Sergeant Bittner or any other

officer. The police placed him in a holding cell, where he remained until approximately 3:20 that afternoon.

At some point during the day, a member of the Town of Greece Police Department informed the Monroe County Department of Social Services, Child Protective Services ("CPS") about the incident. Kathy Bonisteel, a CPS caseworker, contacted Sergeant Bittner to request an interview with the victims as part of her parallel investigation into the sexual abuse allegations. Later that afternoon, Bonisteel and Town of Greece police officers interviewed Karen and CJ at police headquarters. When those interviews concluded, Bonisteel asked to speak with Jackson. Sergeant Bittner agreed and escorted Jackson from his holding cell to a table in the hallway at which Bonisteel sat. The sergeant retreated around a corner where he was out of sight of the table but within earshot of the ensuing conversation.

At the time she interviewed Jackson, Bonisteel knew that he was in custody and had refused to speak with the police. Bonisteel introduced herself as a CPS caseworker, explained her role, and asked Jackson if she could speak with him about the victims' allegations. She did not, however, inform him of his right to an attorney or give him any other warnings. Jackson agreed to speak with her.

During the interview, Jackson first detailed the nature of his relationship with Rebecca and Karen, explaining that he lived with both of them to keep all of his children together. Jackson described himself as the "alpha male" of the family. While he denied hitting either woman, he stated that both Rebecca and Karen knew "what to do" and that he was "in charge." He stated that he regularly engaged in sexual intercourse with each woman

3

separately and, occasionally, all three had sex together.  Jackson asserted that both women knew the "routine" on these latter occasions, which usually occurred in the early morning hours: Jackson would send Rebecca upstairs to wake Karen and bring her to the living room where, on a sheet spread on the floor, Jackson would engage in anal sex with Karen while she performed oral sex on Rebecca.

Jackson told Bonisteel that he began to drink around 8:00 the night of the incident, visiting several bars over the course of the evening.  He also snorted several lines of cocaine.  Jackson did not recall the time he arrived home, but remembered pulling into the driveway and "feeling happy that he . . . made it home safe."  Jackson entered in the house where he found Rebecca sleeping on the couch.  He woke her up "to get a little loving" and, the next he knew, the police were in the house.  In response to Bonisteel's questions, Jackson repeatedly denied hurting CJ, but acknowledged the "possibility" that he may have been "so drunk that he wouldn't have remembered if he raped [her]."

Eventually, a grand jury in Monroe County, New York, charged Jackson in a 48-count indictment with numerous counts of first- and third-degree rape, first- and third-degree sodomy, first-degree attempted sodomy, third-degree assault, first-degree sexual abuse, incest, endangering the welfare of a child, and coercion.  The indictment alleged that on the night of November 29-30, 2000, Jackson committed multiple acts of oral and anal sodomy against Rebecca and Karen, raped and sexually abused CJ a number of times, and committed multiple acts of incest, oral sex, and anal sodomy against CJ.  It also alleged that Jackson (1) assaulted, sexually abused, and committed acts of anal sodomy against Karen in June 1999 and November 2000; (2) coerced, raped, assaulted, and committed acts of oral

and anal sodomy against Rebecca in June 1999, June 2000, and November 2000; and (3)

assaulted his son, "GJ," in June 1999 and January 2000.

## I.        Pretrial Proceedings

On March 23, 2001, County Court Judge Stephen R. Sirkin held a suppression

hearing to determine the admissibility of Jackson's statements to CPS Caseworker Bonisteel.

Jackson, then represented by the Monroe County Public Defender's Office, argued that

Bonisteel acted as an agent of the police when she interviewed him on the day of his arrest.

The trial court disagreed, concluding that Bonisteel interviewed Jackson "as part of a

completely separate civil proceeding" and "did not act as a law enforcement officer or an

agent of a law enforcement officer."  The court held that, as a "child protective worker,"

Bonisteel was not required to give Jackson *Miranda* warnings and, therefore, his statements

to her were admissible at trial.

One week before the scheduled trial date, the State notified Jackson of its intent to

call Tony Arnold—a jailhouse informant also represented by the Public Defender's Office.

This resulted in a conflict that disqualified the Public Defender's Office from the case and

necessitated the appointment of a new defense attorney, Joseph D'Amelio.  Upon his

appointment, D'Amelio informed the court at an April 23, 2001 conference that he needed

one month to prepare for trial.  After the court suggested a start date of June 18, D'Amelio

instead proposed May 29 and the court scheduled trial accordingly.  At some point before

trial, the State furnished the defense with a letter stating that it would not call an expert

medical witness at trial.

5

On the date of trial, County Court Judge Peter E. Corning—the third judge assigned to the case—ruled on the State's intended introduction of Jackson's various prior acts and threats of violence against his family members that occurred between 1983 and 2000. Over defense counsel's objection, the court held that such evidence could be admitted to prove the element of forcible compulsion as to the charged rapes, but ruled that the State would be limited to acts that occurred "subsequent to 1994," because any acts before then were "too remote."

## II.     Trial

### A.     Opening Statements

Assistant District Attorney ("ADA") Cara M. Briggs theorized in her opening statement that Jackson used physical violence and threats of violence to exert control over his family and to force Rebecca and Karen to satisfy his sexual proclivities. Briggs alluded to the testimony the jury would hear from Karen, Rebecca, and CJ about the sexual and physical abuse they suffered at the hands of Jackson on the night of November 29-30, 2000, as well as on a number of previous occasions. The witnesses' testimony, Briggs asserted, would expose Jackson "as a twisted, sadistic man who delighted in controlling the members of his very own family to the point that he abused them constantly."

The defense theory of the case was straightforward: the State would not present any physical evidence of the alleged sexual and physical abuse, and the witnesses fabricated their testimony. Defense counsel highlighted that although the police collected several sheets and the victims' clothing for testing, the jury would not hear the results of those tests.

### B.     State's Trial Evidence

The trial evidence is extensively described in the district court's opinion, *see Jackson v. Conway*, 765 F. Supp. 2d 192, 205-29 (W.D.N.Y. 2011), and we reproduce it here only as necessary for our decision.

       1.       Testimony of Karen, Rebecca, and CJ

Karen and Rebecca told the jury about the nature of their relationship with Jackson, described previous instances of physical and sexual abuse, and gave their accounts of the events of the night of November 29-30, 2000. Karen married Jackson in 1983 and divorced him in 1990, although she continued a relationship with him thereafter. Jackson left Karen's house after the divorce but moved back several months later with Rebecca, whom he married in 1991. From at least 1995 onwards, the three regularly participated in sexual activity together. The State elicited from Rebecca that, shortly after the three began living together, Jackson raped Karen, causing her to become pregnant with a daughter.[1]

Both women described Jackson as controlling and physically abusive. He routinely threatened to kill Karen or injure members of her family if she left him and he hit Rebecca when she disobeyed his orders. In June 1999, Jackson beat and strangled Karen until she lost consciousness. When she woke, he proceeded to engage in oral and anal sex with her.[2] That same month, Jackson became angry with Rebecca, cut her shorts, removed her underwear, and forced her to walk down several city streets in that condition while calling

---

[1] The trial court sustained defense counsel's objection to this testimony, but denied the request for a mistrial.

[2] These allegations were the subject of indictment counts one (first-degree sodomy) and two (third-degree assault).

7

her a "prostitute."[3]  Approximately one year later, in June 2000, Jackson punched Rebecca in the mouth, knocking out one of her teeth.[4]  Jackson hit Rebecca again several days later when she complained about her tooth and then had oral, anal, and vaginal sex with her multiple times.[5]  Two days before the events that led to his arrest, Jackson forced Rebecca and Karen to perform numerous sexual acts.[6]  In the process, Jackson squeezed Rebecca's throat, nearly causing her to lose consciousness.[7]

The women testified that on the night of November 29-30, 2000, Jackson returned home drunk and told Rebecca, who was on the couch, to retrieve Karen from the upstairs bedroom she shared with CJ.  When the women returned to the living room, Jackson had them disrobe and spread a sheet on the floor.  After directing each woman to perform oral sex on him, Jackson had anal sex with Karen.  Several minutes later, Jackson left the living room and went upstairs.  CJ testified that she had been sleeping in her upstairs bedroom when Jackson woke her and took her to his bedroom.  There, he placed her onto the bed,

---

[3] These allegations were the subject of indictment count eight (first-degree coercion).

[4] This allegation was the subject of indictment count nine (third-degree assault).

[5] These allegations were the subject of indictment counts 10-12 (first-degree rape), 13-15 (first-degree (anal) sodomy), and 16-17 (first-degree (oral) sodomy).

[6] These allegations were the subject of indictment count three (first-degree (anal) sodomy as to Karen), count four (first-degree sexual abuse as to Karen), and counts 18-19 (first-degree (oral) sodomy as to Rebecca).

[7] This allegation was the subject of indictment count 20 (third-degree assault as to Rebecca).

touched her breasts, and had both vaginal and anal sex with her.[8] He then returned to the living room, where he again made Rebecca perform oral sex on him before attempting to have anal sex with Karen.

Jackson repeated this cycle of going upstairs to CJ and then returning to Karen and Rebecca in the living room two additional times. The three women testified that, over the course of the entire evening, Jackson made Rebecca perform oral sex on him three times, had anal sex with Karen once and attempted to have anal sex with her twice, and had vaginal sex with CJ "[a]t least twice" and anal sex with her two times.[9] According to Karen, Jackson had difficulty maintaining an erection—while he was "[s]omewhat" erect the first time he had anal sex with her, he was not able to fully penetrate her on the latter two occasions. CJ did not know whether Jackson ejaculated that night. The women complied with Jackson's demands because they were frightened he would become violent if they refused. When Jackson finally fell asleep, Rebecca called the police.

Later, at Rochester General Hospital, medical personnel examined Karen and CJ, taking samples of their pubic hair and swabs of their vaginal and anal areas that they placed into sexual assault kits. Neither Karen nor CJ complained of any injuries to their vaginal or

---

[8] Rebecca and Karen testified that they remained in the living room while Jackson was upstairs but could hear him and CJ over the baby monitor stationed in Jackson's bedroom, where two younger children also slept.

[9] These allegations were the subject of indictment count five (first-degree (anal) sodomy as to Karen); counts 6-7 (first-degree attempted (anal) sodomy as to Karen); counts 21-23 (first-degree (oral) sodomy as to Rebecca); counts 29-32 (first-degree sexual abuse as to CJ); counts 33, 35, and 37 (first-degree rape as to CJ); counts 34, 36, and 38 (third-degree rape as to CJ); 39 and 41 (first-degree sodomy as to CJ); 40 and 42 (third-degree sodomy as to CJ); 43-47 (incest as to CJ); and 48 (endangering the welfare of a child as to CJ).

anal areas, although Karen "always felt like there were cuts" around her anus. At the time of the incident, CJ was menstruating—she put on a sanitary napkin before she went to bed and wore the same one to the hospital. The State introduced two of CJ's medical reports prepared at Rochester General Hospital on November 30, 2000. The first, prepared by Dr. Everett, indicated that a gynecological examination "reportedly" showed the presence of an "irritation at the introitus," or vaginal opening. The second, a sexual assault form prepared by Dr. Thompson, indicated that CJ had no bruises on her body or lacerations in her vaginal area. Dr. Thompson noted, however, the existence of an "abrasion" on CJ's "introitus" and the presence of "old blood in vault."

### 2. Dr. Ann Lenane

Dr. Ann Lenane was an emergency physician at the University of Rochester who worked in the Child Abuse Program. Defense counsel objected as she took the stand, explaining that he believed the State was about to breach its pretrial written representation that it would not elicit expert testimony. ADA Briggs conceded that she had made such a representation, but argued that the defense had subpoenaed the relevant medical records and, as a result, should have been on notice that the State would likely introduce the testimony of a "doctor or a sexual assault nurse examiner." The court stated that Dr. Lenane was entitled to testify about her findings and conclusions made "as a treating physician," but that, due to the lack of notice, the State could not allow her testimony to "escalate" into expert opinion. After ADA Briggs assured the court that she would not elicit from Dr. Lenane any "hypothetical[s]" or "theories," the court permitted the doctor to testify "[a]s a treating physician."

10

Upon retaking the stand, Dr. Lenane described the findings contained in CJ's medical report:

> The relevant physical findings that [CJ] had when she was examined were mainly an abrasion, on the written notes they said [it] was at the introitus, and when they circled on the diagram where that was, it is in the area of the genitalia that is just below the hymen and above the rectal area . . . . The other finding that they noted was old blood in the vulva, which means that he was inside the vagina[.]

App'x at 210. The State then inquired whether the "abrasion[]" indicated on CJ's medical records was "consistent with penetration." Dr. Lenane responded that the abrasion was "consistent with some type of trauma" that "could include penetration, but . . . wouldn't necessarily have to." When asked again whether the abrasion was "consistent with penetration," Dr. Lenane answered, "Yes."

Defense counsel objected as the State attempted to move on to Karen's medical records, arguing that it had not established that the doctor treated Karen. In response to the court's questioning, Dr. Lenane stated that she had not personally examined the women, and that the State had asked her "to review the medical records and express an opinion about the consistency of the history and the physical findings." Upon hearing this, the court sustained defense counsel's objection and excused the jury, explaining that because Dr. Lenane had not personally examined the women, her testimony was that of an expert, not a treating physician. ADA Briggs argued that her questions were not taking Dr. Lenane's testimony beyond "the realm of what the treating physician would be able to say," and repeatedly reiterated her position that the defense should have known that the State would call a doctor to testify about the physical findings contained in the medical reports. At one point, she

11

acknowledged that Dr. Lenane was an expert, but argued that the defense "had notice." The court rejected these arguments, declaring that defense counsel was entitled to rely on the State's pretrial written representation that it would not call an expert.

Defense counsel moved for a mistrial, arguing that he relied on the State's pretrial representation when highlighting in his opening statement the lack of physical evidence. The court, apologizing for its "unfamiliarity with the case," stated that it had "presumed that [Dr. Lenane] was the treating physician." Although it initially considered a mistrial, the court took that option off the table after reviewing the doctor's testimony, explaining that the only expert opinion given was that CJ's "abrasion [wa]s consistent with penetration." Instead, the court gave defense counsel two options: either the court could direct the jury to disregard Dr. Lenane's testimony in its entirety, or defense counsel could have the weekend to obtain his own expert. When defense counsel declared it impossible to hire an expert on such short notice, the court expressed confusion as it had previously authorized the defense to consult with a medical expert. Defense counsel explained that although he had "review[ed] the records" with a nurse, he did not intend to "bring a nurse in here to try and combat what a doctor had to say on the issue of abrasion versus irritation." Accordingly, defense counsel opted for the curative instruction.

After recalling the jury, the court stated that initially it had been "a little bit unclear" about whether the State brought Dr. Lenane "in as a treating physician or . . . as an expert" but, as she testified, it had become evident she was an expert. The court explained:

> [B]efore bringing in an expert, the [State] must give notice to the defendant . . . which they failed to do. . . . Accordingly, I am directing you to disregard the testimony of Dr. Lenane on the grounds that she was called as an expert and no notice was

12

> given . . . . Any statements of fact or any conclusions that she
> would render to you I direct that you disregard in their entirety.

App'x at 228-29. Later in the proceeding, defense counsel objected to the nature of the

curative instruction, asserting that the court had given "the impression that but for that

improper notice," the testimony would have been acceptable, "rather than advising the jury

that the evidence was improper[ly] before them and should not be considered." The court

overruled this objection.

3.     Jailhouse Informant Tony Arnold

Tony Arnold, who shared a cell with Jackson, testified that Jackson told him about

the November 29-30, 2000 incident. According to Arnold, Jackson stated that he was

intoxicated and had sex with "both of his wives," who waited until he fell asleep and then

called the police with allegations that he had raped his daughter. Jackson offered Arnold

$100,000 to kill his "wife and ex-wife," which Arnold declined.

4.     Kathy Bonisteel

CPS Caseworker Kathy Bonisteel related Jackson's statements made to her during

their post-arrest conversation at police headquarters. This testimony included Jackson's

assertion that he was sexually active with both Karen and Rebecca, his claim that both

women knew the sexual "routine" they were to perform, and his boast that he was the

"alpha male" who was "in charge" of the family. Bonisteel also recounted Jackson's version

of the events on the night of November 29-30, 2000—that he had returned home after

consuming a large amount of alcohol and some cocaine, woke Rebecca for "a little lovin'"

and then remembered nothing more until he was awoken by the police. With respect to

Jackson's statements about CJ, Bonisteel testified:

13

> I asked [Jackson] if he remember[ed] [molesting his daughter], or if he did that. He said he would never hurt [CJ]. And I asked him again if anything happened the night before when he got home. He repeated again that he would never hurt [CJ]. . . . I said, was it possible that he was so drunk that he couldn't remember raping [CJ]? And he said it was a possibility.

Trial Tr. at 503-04.

### C.     Closing Arguments

The defense did not introduce any evidence at trial. In closing, defense counsel pointed out that despite their allegations of rape and assault, Rebecca and Karen had both lived with Jackson for many years without complaint. Counsel also emphasized that although police had collected the sheets, victims' clothing, and sexual assault kits, the State had been unable to present at trial any physical evidence of the numerous alleged acts of rape and sodomy that occurred on the evening of November 29-30, 2000.

ADA Briggs began her closing argument by telling the jurors that the case required their "courage" to recognize that the allegations "really happened" and that the "person [who] committed these heinous, horrific acts has been sitting in the same room with [the jurors] for almost a week now." Pointing Jackson out, ADA Briggs stated, "that man sitting there, looking like he is pondering every word that is being said, is guilty."[10] ADA Briggs argued that "no one can feign the terror" that the victims had displayed and that "[e]ven the best actor or actress could probably not tremble with fear as continuously as some of these witnesses did." She also questioned why Jackson's family members would testify against

---

[10] The trial court overruled defense counsel's objection to this statement.

14

him, positing that "[t]he only possible explanation for what they told [the jury] is because it is

true and he is guilty."[11] The witnesses' testimony, ADA Briggs contended, left the jury with

"a picture of a man that has consistently abused his family for years, basically beaten them

into submission and he committed all of the counts of the indictment here against his family.

. . . He is guilty of everything."

With respect to the lack of physical evidence, ADA Briggs argued that the absence of

semen did not contradict the witnesses' testimony, as both Rebecca and Karen testified that

Jackson had been unable to "get an erection" the evening of November 29-30, 2000. ADA

Briggs also argued that CJ's medical records corroborated her version of the events because

the "abrasion" on her introitus was "right where [Jackson's] penis would have been

rubbing."

Addressing Bonisteel's testimony, ADA Briggs stated:

> Kathy Bonisteel asked [Jackson], Is it possible that you were so
> drunk that you don't remember raping [CJ]? And he says, Yeah,
> that's possible. Now, I ask you, ladies and gentlemen, if you
> were a person who stood accused of having sex with your own
> child, and you hadn't done it, if somebody asked you if that was
> possible, would you say 'maybe,' or would your answer be, no, I
> would never, ever, ever do something like that? There would be
> adamant denial, there would be something of a much stronger
> reaction than, "Yeah, maybe, I could have." And the reason he
> says, "Yeah, maybe, I could have" is because he did. It's that
> simple. Innocent people don't admit that there is a possibility
> that they did something wrong, particularly when what we are
> talking about is sex with his own daughter.

App'x at 271.

---

[11] The trial court overruled defense counsel's objection to this statement.

Following closing arguments, defense counsel unsuccessfully moved for a mistrial on the ground that the summation was "replete with comments arousing sympathy for the victims." Defense counsel also took issue with the State's proposed jury charge on the first-degree sodomy counts because, in defense counsel's view, first degree sodomy "require[d] some penetration." The court disagreed, declaring that "[j]ust touching" was sufficient. In its subsequent jury charge, the trial court reminded the jury that statements made by the attorneys in summation were not evidence and that the jurors were to draw their own conclusions from the facts, rather than rely on those supplied by counsel. It also reminded the jury that it was not to consider any testimony the court had ordered stricken from the record.

Ultimately, the jury convicted Jackson on all 47 submitted counts.[12] On June 21, 2001, the trial court sentenced Jackson to an aggregate total of 64 years' incarceration.

## III. State Postconviction Proceedings & Direct Appeal

Through counsel, Jackson appealed his judgment of conviction to the New York State Supreme Court, Appellate Division, Fourth Department. Proceeding *pro se*, he simultaneously moved in the trial court to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10.

### A. *Section 440.10 Motion*

Jackson argued in his § 440.10 motion that defense counsel's performance was deficient in several respects. He indicated that he had brought the motion before filing his

---

[12] At the close of the State's evidence, the trial court dismissed one endangering the welfare of a child count involving Jackson's youngest son.

appellate brief because the trial record was insufficient to permit direct appellate review of his ineffective assistance claims. As exhibits to his motion, Jackson included reports of tests performed by the Monroe County Public Safety Laboratory. The first report found no spermatozoa or "seminal material" on any of the victims' clothing or on the vaginal and anal swabs taken of Karen and CJ as part of the sexual assault kits. The second, dated March 27, 2001, excluded CJ as the source of DNA obtained from bloodstains found on the fitted sheet recovered from Jackson's bed.

In its response, the State principally argued that the motion should be summarily denied pursuant to New York Criminal Procedure Law § 440.10(2)(b) because Jackson's direct appeal remained pending and the record contained facts sufficient to permit adequate appellate review of his ineffective assistance claims. By order dated November 17, 2003, the trial court agreed with the State and denied Jackson's motion on the ground that the record contained sufficient facts to permit review of his claims on direct appeal.[13] Jackson sought from the Appellate Division leave to appeal this decision but it denied his application on February 3, 2004.

B. *Direct Appeal*

While his § 440.10 motion remained pending in the trial court, Jackson filed a counseled appellate brief in the Fourth Department. In that brief he argued that his post-arrest statements made to CPS Caseworker Bonisteel were improperly admitted in violation

---

[13] The trial court also held, in the alternative, that Jackson's ineffective assistance claims lacked merit because they constituted nothing more than his disagreement with defense counsel over trial strategy and tactics.

of his *Miranda* rights, that prosecutorial misconduct denied him a fair trial, and that he received ineffective assistance of counsel.[14]  In his *Miranda* claim, Jackson argued that Bonisteel acted either as a law enforcement officer or as the "functional equivalent" of a police officer when she interviewed him without first providing the required *Miranda* warnings, and that his statements to her were thus inadmissible.  In his prosecutorial misconduct claim, Jackson maintained that ADA Briggs's improper conduct "pervaded the proceedings" and deprived him of a fair trial.  He identified four instances of such misconduct: (1) the delayed disclosure that Tony Arnold would be a witness, which prompted a last minute change in defense counsel; (2) the opening statement comments about Jackson's "twisted" and "sadistic" nature; (3) the improper attempt to elicit expert testimony from Dr. Lenane; and (4) the summation, in which ADA Briggs repeatedly expressed her personal opinion of Jackson's guilt and the truth of the witnesses' testimony, and argued facts not in evidence.

Jackson's ineffective assistance arguments were essentially the same as those raised in his § 440.10 motion.[15]  With respect to defense counsel's pretrial conduct, Jackson contended that his attorney: (1) did not adequately investigate the forensic and medical evidence or consult with an expert concerning that evidence; and (2) failed to prepare

---

[14] Jackson also argued that the trial court erred when, in contravention of its pretrial ruling, it permitted the State to elicit testimony concerning Jackson's prior bad acts that occurred before 1995.

[15] Jackson included his § 440.10 motion and attached exhibits in the record submitted to the Fourth Department.

adequately for trial, as shown by his unfamiliarity with the elements of first-degree sodomy. As for counsel's trial conduct, Jackson maintained that counsel: (1) presented no evidence and called no witnesses in defense, thus failing "to utilize the plethora of indisputable scientific evidence" not introduced by the State; (2) failed to utilize the medical and forensic evidence to conduct effective cross-examinations of the victims by exposing inconsistencies between their accounts of the sexual abuse and the medical findings; and (3) failed to offer expert medical testimony to explain the medical and forensic evidence.[16]

The Fourth Department affirmed Jackson's conviction on February 11, 2004, but reduced his overall sentence to 50 years' imprisonment on New York statutory grounds not relevant here. *See People v. Jackson*, 772 N.Y.S.2d 149, 150 (App. Div. 4th Dep't 2004). The Fourth Department held that Jackson's *Miranda* claim was meritless because the "record establishe[d] that [Bonisteel] was not engaged in law enforcement activity." *Id.* (citation omitted).[17] Addressing the prosecutorial misconduct claim, the Fourth Department held that "the comments of the prosecutor in her opening and closing statements were not so egregious as to deprive defendant of his right to a fair trial." *Id.* (brackets, quotation marks, and citation omitted). Finally, it rejected Jackson's "contention . . . that he received

---

[16] In response to Jackson's ineffective assistance arguments, the State contended on direct appeal that the claim was "based on factual assertions outside the appropriate record" and therefore could be remedied only via a § 440.10 motion, notwithstanding its position in the § 440.10 proceeding that the claims were only properly raised on direct appeal.

[17] The Fourth Department also rejected this claim on the ground that "[t]he filing of a child abuse petition does not trigger the right to counsel" and, therefore, Bonisteel "was not required to advise defendant of his *Miranda* rights before speaking with him." *Id.* (citation omitted).

19

ineffective assistance of counsel," holding that he was "not entitled to error-free

representation" and had "failed to demonstrate the absence of strategic or other legitimate

explanations for counsel's alleged failures." *Id.* (citations and quotation marks omitted).

Jackson sought leave to appeal all of his claims to the New York Court of Appeals.

Then-Chief Judge Kaye denied his application on May 20, 2004, *see People v. Jackson*, 2 N.Y.3d

801 (2004) (table), and Jackson timely filed a habeas application in the United States District

Court for the Western District of New York pursuant to 28 U.S.C. § 2254.

## IV.    Federal Habeas Proceedings

In his § 2254 petition and addendum to that petition, Jackson raised his *Miranda*,

prosecutorial misconduct, and ineffective assistance claims, with some slight modifications

to the latter two.  First, Jackson added to his allegations of prosecutorial misconduct the

prosecutor's "improper tactics of introducing prior uncharged crimes and bad acts" and her

"abuse of the charging function."  Second, Jackson divided his ineffective assistance claim

into four "points."  In "Point One," Jackson argued that defense counsel's lack of

preparation was "painfully exposed" by counsel's "decision to <u>NOT</u> put on a defense . . .

due to the fact that he was under the <u>incorrect assumption</u> that the prosecution was required

to prove the element of penetration in order to sustain a conviction of Sodomy in the 1st."

App'x at 15 (emphasis in original) (additional capitalization removed).  Jackson maintained in

"Point Two" that counsel "failed to correctly marshal an investigation into the plethora of

exculpatory evidence (physical, medical, forensic, visual, tactile, [etc.])" and then failed to

introduce this evidence at trial.  *Id.* at 16 (capitalization removed).  In "Point Three" he

contended that defense counsel failed to consult with a medical expert "to help him interpret

20

and then apply through [t]estimony the results of the entire battery" of medical and forensic tests. *Id.* at 16-17. Finally, in "Point Four," Jackson asserted that the above deficiencies, coupled with defense counsel's failure to cross-examine the victims using the medical evidence, constituted ineffective assistance. *Id.* at 17.

After reviewing the petition, the magistrate judge appointed counsel and ordered an evidentiary hearing pursuant to our decision in *Sparman v. Edwards*, in which we expressed our belief that "a district court facing the question of constitutional ineffectiveness of counsel should . . . offer the assertedly ineffective attorney an opportunity to be heard and to present evidence." 154 F.3d 51, 52 (2d Cir. 1998) (per curiam). At the resulting hearing, the magistrate judge heard testimony from a medical expert and from defense counsel, who explained his trial preparation and strategy.

By amended order entered in February 2011, the magistrate judge granted Jackson's application for habeas relief in part. *See Jackson v. Conway*, 765 F. Supp. 2d 192 (W.D.N.Y. 2011). The magistrate judge held that the Fourth Department's rejection of Jackson's *Miranda* claim was both contrary to and an unreasonable application of clearly established Supreme Court precedent, and that the admission of his post-arrest statement to Bonisteel was sufficiently injurious as to warrant habeas relief on the convictions involving CJ. *See id.* at 270-84. The magistrate judge also held that the prosecutor's pretrial and trial conduct cumulatively deprived Jackson of his right to due process, and that the Fourth Department's decision to the contrary was an unreasonable application of Supreme Court precedent. *See id.* at 251-60. Finding that the prosecutor's misconduct "permeated the entire trial

21

proceeding," the magistrate judge vacated all of Jackson's convictions on this ground. *Id.* at 253, 260.

Next, the magistrate judge found that Jackson had failed to exhaust in the state courts Points One and Two of his ineffective assistance claim, and that those Points were barred by the operation of a state procedural rule because they could have been, but were not, raised on direct appeal. *See id.* at 260-61. The magistrate judge grouped Jackson's remaining ineffective assistance arguments into two sections—counsel's failure to consult with and call a medical expert to explain State's medical evidence, and counsel's failure to investigate adequately the medical and forensic reports not introduced by the State at trial. *See id.* at 262-70. The magistrate judge found habeas relief was warranted only as to the first group, and then only as to the convictions involving CJ, because it was as to those allegations that the State's medical evidence and the defense's lack of a medical expert were most damaging. *See id.* at 262-68.

For these reasons, the magistrate judge directed the State to vacate Jackson's convictions on all counts unless it commenced re-prosecution of Jackson within ninety days. *Id.* at 287. The magistrate judge stayed the judgment pending the completion of any appellate proceedings. *Id.* The State appealed insofar as the magistrate judge granted habeas relief and Jackson cross-appealed those portions of the decision adverse to him.

## DISCUSSION

We review a district court's grant of habeas relief *de novo*, and its underlying findings of fact for clear error. *See Cardoza v. Rock*, 731 F.3d 169, 177 (2d Cir. 2013).

## I.    Rules Governing Federal Habeas Corpus Review under the Antiterrorism and Effective Death Penalty Act of 1996

As amended by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA") and interpreted by the Supreme Court, 28 U.S.C. § 2254—the statutory

provision authorizing federal courts to provide habeas corpus relief to prisoners in state

custody—is "part of the basic structure of federal habeas jurisdiction, designed to confirm

that state courts are the principal forum for asserting constitutional challenges to state

convictions." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 787 (2011).  A number of

requirements and doctrines, four of which are relevant to this appeal, ensure the centrality of

the state courts in this arena.  First, the exhaustion requirement ensures that state prisoners

present their constitutional claims to the state courts in the first instance.  *See id.* (citing 28

U.S.C. § 2254(b)).  Should the state court reject a federal claim on procedural grounds, the

procedural default doctrine bars further federal review of the claim, subject to certain well-

established exceptions.  *See generally Wainwright v. Sykes*, 433 U.S. 72, 82-84 (1977).  If the state

court denies a federal claim on the merits, then the provisions of § 2254(d) come into play

and prohibit federal habeas relief unless the state court's decision was either: (1) "contrary to,

or involved an unreasonable application of, clearly established Federal law," or (2) "based on

an unreasonable determination of the facts in light of the evidence presented in the State

court."  28 U.S.C. § 2254(d)(1)-(2).  Finally, when conducting its review under § 2254(d), the

federal court is generally confined to the record before the state court that adjudicated the

claim.  *See Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398-99 (2011).

Because the issues presented in this appeal implicate all of the above facets of federal habeas jurisdiction, we provide a general overview of the standards governing each before applying those standards to Jackson's case.

*A.    Exhaustion and Procedural Default*

To provide the state with the first opportunity to consider and correct alleged violations of its prisoners' constitutional rights, a state prisoner is required to exhaust all of his available state remedies before a federal court can consider his habeas application. *See* 28 U.S.C. § 2254(b)(1)(A); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011). This requires that the prisoner "fairly present" his constitutional claim to the state courts, which he accomplishes "by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005) (citing *Cotto v. Herbert*, 331 F.3d 217, 237 (2d Cir. 2003)). While "a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement," he must tender his claim "in terms that are likely to alert the state courts to the claim's federal nature." *Carvajal*, 633 F.3d at 104 (internal citations, quotation marks, and brackets omitted).

A state prisoner's procedural default in the state courts will also bar federal review except in narrow circumstances not relevant here. A procedural default occurs in one of two ways. First, if the state prisoner fails to exhaust his state remedies in a manner in which, were he to return to the state courts with his unexhausted claim, those courts would find the claim barred by the application of a state procedural rule, "we 'must deem the claim procedurally defaulted.'" *Id.* (quoting *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001))

24

(brackets omitted). Alternatively, a procedural default occurs if the state court's rejection of a federal claim rests on a state law ground—such as the operation of a state procedural rule—that is both "'independent of the federal question and adequate to support the judgment.'" *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). In this latter case, "[t]he preclusion of federal review applies only when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006) (internal quotation marks omitted); *see also Harris v. Reed*, 489 U.S. 255, 262 (1989) ("[A] federal claimant's procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default.").

B. *28 U.S.C. § 2254(d) –Review of State Court Decisions on the Merits*

As noted above, § 2254(d) is implicated when the habeas petitioner seeks federal review of a constitutional claim that was adjudicated by the state courts on the merits. As relevant here, AEDPA provides that habeas relief "shall not be granted" on such claims "unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[18] The analysis under § 2254(d)(1) proceeds in two steps. The first is to identify the governing "clearly established Federal law." *See Marshall v. Rodgers*, __ U.S. __, 133 S. Ct. 1446, 1449 (2013) (per curiam)

---

[18] Section 2254(d)(2), which permits federal relief if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court," is not implicated in this case.

("The starting point for cases subject to §2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims."); *Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004) ("We begin by determining the relevant clearly established law."). The second asks whether, in the context of the petitioner's case, the state court's decision was contrary to or an unreasonable application of that clearly established precedent. *See Alvarado*, 541 U.S. at 663; *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Separate considerations govern each step, and it is to those that we now turn.

### 1. "Clearly Established" Federal Law

In the AEDPA context, "'[c]learly established federal law' refers only to the holdings of the Supreme Court" extant at the time of the relevant state court decision. *Rodriguez v. Miller*, 537 F.3d 102, 106 (2d Cir. 2008); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) ("'[C]learly established law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." *Rodriguez*, 537 F.3d at 106-07 (citing *Carey v. Musladin*, 549 U.S. 70, 74, 76-77 (2006)); *see also Marshall*, 133 S. Ct. at 1451 (A federal habeas court "may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."). While we may rely on our prior decisions to the limited extent that we have "already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall*, 133 S. Ct. at 1450

26

(citation omitted), we must scrupulously avoid using our decisions (or those of other circuits) "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced," *id.* (citing *Parker v. Matthews*, 567 U.S. ---, 132 S. Ct. 2148, 2155 (2012) (per curiam)); *see also Rodriguez*, 537 F.3d at 109 (observing that we may no longer rely "on our own precedents to interpret and flesh out Supreme Court decisions").

### 2. The "Contrary to" and "Unreasonable Application" Prongs

Once the clearly established Supreme Court principle has been distilled, the petitioner may pursue relief under § 2254(d)(1) via two paths. First, he may show that the state court's decision was "contrary to" that clearly established principle by demonstrating either (1) "that the state court reached a conclusion of law that directly contradicts" a Supreme Court holding, or (2) that the state court arrived at a result opposite to that reached by the Supreme Court when presented with "'facts that are materially indistinguishable from [the] relevant Supreme Court precedent.'" *Evans v. Fischer*, 712 F.3d 125, 132 (2d Cir. 2013) (quoting *Williams*, 529 U.S. at 405).

More commonly, a petitioner may seek relief by demonstrating that the state court's decision involved an "unreasonable application" of the clearly established principle. A state court unreasonably applies clearly established law if it "'identifies the correct governing legal principle but unreasonably applies that principle to the facts' of the case before it." *Id.* (quoting *Williams*, 529 U.S. at 413) (ellipsis omitted). In this analysis, a state court's "unreasonable" application of law is not synonymous with an "incorrect" or "erroneous" decision. *See Andrade*, 538 U.S. at 75. Thus, "a federal habeas court may not issue the writ

27

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). Instead, the state court's application must be "objectively unreasonable," *id.* (quotation marks omitted), which, we have recognized, requires "some increment of incorrectness beyond error," *Evans*, 712 F.3d at 133 (quotation marks omitted).[19] Whether the state court's application is "objectively unreasonable" depends, in part, on the specificity of the clearly established rule of law. *See Alvarado*, 541 U.S. at 664. If a legal rule is very specific, then the range of reasonable applications of that rule is correspondingly narrow.[20] *See id.* By contrast, "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Id.* In short, the standard under the unreasonable application prong of § 2254(d)(1) "is difficult to meet," *Richter*, 131 S. Ct. at 786, and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision," *id.* (quoting *Alvarado*, 541 U.S. at 664).

---

[19] We have also recognized, however, that "'the increment of incorrectness beyond error need not be great; otherwise, *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011) (quoting *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009)).

[20] A necessary corollary to this point is that "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted).

Finally, federal review under either prong of § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398-99.  Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 1399.  Put another way, the rule expressed in *Pinholster* generally "prohibits us from relying on evidence beyond the state court record to reach our result." *Young v. Conway*, 715 F.3d 79, 82 (2d Cir. 2013) (Parker, J., concurring in the denial of rehearing *en banc*).

With these principles in mind, we turn to the merits of Jackson's claims.

## II.    *Miranda* Claim

As part of his *Miranda* claim pressed in the Fourth Department, Jackson argued that CPS Caseworker Bonisteel acted as the "functional equivalent" of a police officer because she was a government employee who interrogated him about the events leading to his arrest. *See* App'x at 100-01.  As relevant here, the Fourth Department rejected the *Miranda* claim on the ground that Bonisteel "was not engaged in law enforcement activity." *See Jackson*, 772 N.Y.S. 2d at 150.[21]  Jackson argues, and the magistrate judge held, that this conclusion was

---

[21] We agree with the magistrate judge that the Fourth Department's alternate holding—that "[t]he filing of a child abuse petition does not trigger the right to counsel" and therefore Bonisteel "was not required to advise defendant of his *Miranda* rights before speaking with him"—is not relevant to this inquiry. *See Jackson*, 772 N.Y.S.2d at 150 (citing *People v. Brooks*, 585 N.Y.S.2d 30, 31 (App. Div. 1st Dep't 1992)).  As the district court explained, *see Jackson*, 765 F. Supp. 2d at 275, the case cited by the Fourth Department in support of this proposition, *People v. Brooks*, in turn relied on the New York Court of Appeals decision in *People v. Smith*. *See Brooks*, 585 N.Y.S.2d at 31 (citing *People v. Smith*, 62 N.Y.2d 306 (1984)).  That Court of Appeals case dealt with the issue of whether the initiation of civil child neglect proceedings triggered the father's right to counsel under the Sixth Amendment. *See Smith*, 62 N.Y.2d at 312-13.  Here, the issue before us is not whether Bonisteel's initiation of civil child abuse proceedings implicated Jackson's right to counsel, but whether the admission at

29

both contrary to, and an unreasonable application of, the clearly established federal law set forth in the holdings of *Miranda*, 384 U.S. at 436, *Mathis v. United States*, 391 U.S. 1 (1968), and *Estelle v. Smith*, 451 U.S. 454 (1981). *See Jackson*, 765 F. Supp. 2d at 275-82. While we do not find relief warranted under the "contrary to" prong of § 2254(d)(1), we agree with the magistrate judge that the Fourth Department's rejection of Jackson's *Miranda* claim constituted an objectively unreasonable application of this Supreme Court precedent. We further hold that the admission of Jackson's statements had a substantial and injurious effect or influence on the jury's verdict as to the count's involving CJ. We therefore affirm the magistrate judge's judgment insofar as it granted habeas relief on those counts.

### A.     Clearly Established Law

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (extending the protection from compulsory self-incrimination to the states through the Fourteenth Amendment). In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444; *see also Georgison*, 588 F.3d at 155 ("It is well settled that *Miranda* requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, *inter alia*, of their right to remain silent and to

_____

Jackson's criminal trial of his statements to Bonisteel violated his Fifth Amendment right to be free from compulsory self-incrimination.

have an attorney present during questioning."). Should a person subject to custodial interrogation invoke his right to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 473-74. In this case, the admissibility of later statements made by the suspect will turn on "whether his right to cut off the questioning was scrupulously honored." *Michigan v. Mosely*, 423 U.S. 96, 104 (1975) (internal quotation marks omitted); *see id.* at 106 (holding a statement made after the suspect's invocation of his *Miranda* rights admissible when questioning resumed "only after the passage of a significant period of time and the provision of a fresh set of warnings," and the second interrogation was restricted "to a crime that had not been a subject of the earlier interrogation").

The *Miranda* safeguards apply only to "custodial interrogations." That phrase has two components: the "in custody" requirement, *see, e.g.*, *Stansbury v. California*, 511 U.S. 318, 322 (1994), and the "interrogation" requirement, *see, e.g.*, *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Only the interrogation requirement is at issue here—the State has never argued that Jackson was not "in custody" at the time Bonisteel interviewed him.[22] In the context of *Miranda*, "the term 'interrogation' . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. Absent an interrogation, there can be no infringement of the Fifth Amendment rights *Miranda* was designed to protect. *See Edwards v.*

---

[22] In its brief submitted to the Fourth Department, the State apparently conceded that Jackson was in custody at the time he spoke to Bonisteel. *See* App'x at 120 ("[W]hile in custody at the Greece police station, the defendant agreed to speak to Kathy Bonisteel."). In the district court, the State did not contest that Jackson was in custody.

*Arizona*, 451 U.S. 477, 485 (1981) (defendant's "voluntary, volunteered statements" not protected). While the *Innis* definition of "interrogation" speaks only in terms of questioning or other actions on the part of the "police," the Supreme Court has not strictly limited its holdings in this regard to law enforcement personnel conducting criminal investigations.

In *Mathis*, the defendant was incarcerated on a state sentence when an agent of the Internal Revenue Service ("IRS") questioned him about discrepancies on his federal tax returns. *See* 391 U.S. at 3 & n.2. Over the defendant's objection that he was not provided the requisite *Miranda* warnings, the government was permitted to introduce the defendant's incriminating statements to the IRS agent at the defendant's criminal trial for tax fraud. *See id.* at 3. Before the Supreme Court, the government sought to "escape application of . . . *Miranda*" by arguing that the IRS agent's "questions were asked as a part of a routine tax investigation where no criminal proceedings might even be brought." *Id.* at 4. The Court rejected this argument, observing that although tax investigations may be initiated "for the purpose of a civil action," they "frequently lead to criminal prosecutions." *Id.* The Court also noted that the IRS agent who interviewed the defendant admitted that "there was always the possibility during his investigation that his work would end up in a criminal prosecution." *Id.* For these reasons, the Court "reject[ed] the contention that tax investigations are immune from the *Miranda* requirements for warnings to be given a person in custody." *Id.*[23]

_____

[23] The second part of the *Mathis* opinion rejected the government's argument that *Miranda* was applicable only to questioning of those "in custody in connection with the very case under investigation." *See id.* at 4-5 (internal quotation marks omitted). As to this argument,

In *Smith*, 451 U.S. at 454, the Court again analyzed the *Miranda* requirements in the context of questioning by someone other than a law enforcement official. In that case, the trial judge ordered the prosecutor to arrange a psychiatric evaluation of the criminal defendant to determine his competency to stand trial. *See id.* at 456-57. Without administering *Miranda* warnings, a doctor examined the defendant for approximately 90 minutes while he was in custody, ultimately concluding that the defendant was competent. *Id.* at 457. After a jury convicted the defendant, the examining doctor was the state's sole witness at the capital sentencing stage of the trial, where, in order to obtain a sentence of death, the state had to prove the defendant's future dangerousness beyond a reasonable doubt. *Id.* at 457-58. Based on his 90-minute examination of the defendant before trial, the doctor offered a number of "devastating" opinions as to the defendant's future dangerousness. *Id.* at 459-60. The jury's subsequent verdict made the death penalty mandatory. *Id.* at 460.

On federal habeas review, the lower courts vacated the death sentence based on the admission of the doctor's statements. *Smith*, 451 U.S. at 460. The Supreme Court affirmed, holding that the defendant's Fifth Amendment privilege was "directly" implicated because the state used against him "the substance of his disclosures during the pretrial psychiatric examination," *id.* at 464-65, and the defendant was not warned that this "compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death," *id.* at 467. Because the defendant "did not voluntarily

the Court held that nothing in *Miranda* suggested that its warning requirement was dependent "on the reason why the person is in custody." *Id.* at 5.

33

consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements," the Court held that the defendant's Fifth Amendment right against self-incrimination was violated. *Id.* at 468. In reaching this conclusion, the Court found it "immaterial" that the defendant "was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, governmental informant, or prosecuting attorney." *Id.* at 467. The Court explained that, when the doctor "went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of [the defendant's] future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.*

B.      *Application*

Under the circumstances of Jackson's case, the state court's rejection of his *Miranda* claim on the ground that Bonisteel "was not engaged in law enforcement activity," *see Jackson*, 772 N.Y.S.2d at 150, was an objectively unreasonable application of the above holdings. Echoing the Fourth Department, the State argues that Jackson's *Miranda* claim must be denied because Bonisteel interviewed Jackson in connection with "an independent civil investigation for possible family court action." State Br. at 35. As the above Supreme Court holdings make clear, where, as here, custody (as that term is used in *Miranda* and its progeny) is not at issue, whether the questioning official was engaged in "law enforcement activity" at the time incriminating statements are made is not the touchstone for applying the *Miranda* warning requirements. *Mathis*'s rejection of the argument that *Miranda* did not apply

34

to "routine tax investigation[s]" in which "no criminal proceedings might even be brought," requires as much. *Mathis*, 391 U.S. at 4.

The State argues that *Mathis* is inapplicable to Jackson's case because it dealt with a civil investigation by the IRS, which has "unique dual roles, focusing on both civil and criminal enforcement of the federal tax laws." State Br. at 36. Nothing in *Mathis* suggests, however, that the Court based its holding on the dual nature of IRS agents' roles. Instead, the Court focused on the "possibility" that the IRS agent's tax investigation would lead to a criminal prosecution, and the agent's awareness of that possibility during his investigation. *See Mathis*, 391 U.S. at 4. Here, Bonisteel was certainly aware of a similar possibility at the time she conducted her investigation into the allegations that Jackson had sexually abused CJ on the evening of November 29-30, 2000. While her investigation was civil in nature, if she discovered during the course of that investigation that Jackson sexually abused CJ, Bonisteel was required by New York law to report that finding to the "appropriate local law enforcement" authorities. N.Y. Soc. Serv. Law § 424(5-a). She in fact made such a determination at the conclusion of her interview with Jackson. *See* App'x at 171. Jackson's case therefore falls within the ambit of *Mathis*.[24]

---

[24] The State also apparently urges us to disregard *Mathis* because the eight Justices who decided it were "conflicted." *See* State Br. at 35-36 ("With [three] Justices dissenting (and one not participating in the case); however, even the Supreme Court was conflicted on the holding."). While there are times when lower courts may have wished they were permitted to so cavalierly disregard the holding of five Supreme Court Justices as advocated by the State, only the Supreme Court is vested with "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

Our conclusion that the nature of the investigation is not the benchmark for determining the applicability of *Miranda* does not end the matter. Instead, we must focus on whether Bonisteel's interview of Jackson constituted an "interrogation" within the meaning of *Innis*, *i.e.*, whether Bonisteel objectively "should have known" that her questions were "reasonably likely to evoke an incriminating response." *Innis*, 446 U.S. at 301-02 (emphasis removed); *accord Mathis*, 391 U.S. at 4 (observing that the IRS agent who interviewed the defendant acknowledged that the "there was always the possibility during his investigation that his work would end up in a criminal prosecution"). As she testified during the suppression hearing, Bonisteel knew at the time of the interview that Jackson had been arrested and was in police custody as a result of the same sexual abuse allegations she was investigating. *See* App'x 153-55, 168, 171. It is therefore clear from the record that Bonisteel should have known that her express questioning about CJ's rape allegations and about whether Jackson "did anything to [CJ]" could elicit an incriminating response. *Contra Innis*, 446 U.S. at 302-03 (no interrogation when two officers held a conversation between themselves concerning the defendant's missing firearm and the defendant merely commented on that conversation).[25] Because Jackson was not informed prior to Bonisteel's

_____

[25] The State faults the district court for "latch[ing] on to dicta" contained in the Third Circuit's decision in *Saranchak v. Beard*, 616 F.3d 292 (3d Cir. 2010), and argues that our analysis should be guided by the Third Circuit's ultimate holding. State Br. at 33-34. In that case, the Third Circuit found no *Miranda* violation when the state introduced at the defendant's murder trial certain incriminating statements the defendant made to a child services caseworker while in custody. *See Saranchak*, 616 F.3d at 298-99, 303-04. The facts of Jackson's case, however, are distinguishable from those addressed in *Saranchak*. Unlike here, the caseworker in *Saranchack* was a "stranger to any aspect" of the defendant's pending murder charges and interviewed the defendant only in connection with his visitation rights

interrogation that his statements to her could be introduced at his criminal trial, the State

should not have been permitted to rely on those statements to secure Jackson's conviction.

*See Miranda*, 384 U.S. at 444; *see also Smith*, 451 U.S. at 468-69. Accordingly, the admission of

Bonisteel's testimony at trial violated Jackson's right to be free from compelled self-

incrimination under the Fifth and Fourteenth Amendments.[26]

    *C.    Harmlessness*

    The erroneous admission of a defendant's statements in violation of *Miranda* is

subject to harmless-error review. *See Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010).

---

with his minor children. *See id.* at 303-04. The Third Circuit determined that no "interrogation" had occurred because, under those circumstances, the caseworker's interview "was not of the kind, like a tax investigation, that has a high probability of leading to informant testimony at a criminal trial." *Id.* at 304. In reaching this conclusion, the Third Circuit expressly distinguished circumstances where a child services caseworker interviews a defendant "charged with offenses involving children." *Id.* (emphasis removed). We do not rely on *Saranchak* to reach our conclusion.

[26] The State contends that applying *Miranda* to Bonisteel's interrogation would have "disastrous implications for social work," but does not identify any such implications. State Br. at 35. Nor do we discern any such disastrous results. *Miranda* prevents only the *prosecution's* use of unwarned statements against a criminal defendant in his criminal trial. Its prophylactic requirements, therefore, pose no impediment to social workers conducting custodial interrogations in order to substantiate allegations of sexual abuse. *Cf. Smith*, 451 U.S. at 468-69 (noting that if the defendant had invoked his *Miranda* rights prior to the court-ordered psychiatric examination, the examination could have proceeded with the understanding that his statements would be used only to assess his competency, rather that establish his future dangerousness at trial). Nor does it prevent social workers from sharing the results of their investigations with law enforcement agents to help build a criminal case. *Cf. id.* at 467 (finding that the doctor's "role changed" only when he "testified for the prosecution" at trial). It does not even prevent the introduction of statements made during such custodial interrogations in a civil proceeding such as one brought to terminate parental rights. *See Chavez v. Martinez*, 538 U.S. 760, 770 (2003) ("[A] violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself *in a criminal case*." (emphasis removed in part, added in part)).

"'[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the substantial and injurious effect standard set forth in [*Brecht v. Abrahamson*].'" *Wood v. Ercole*, 644 F.3d 83, 93-94 (2d Cir. 2011) (quoting *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007)) (additional internal quotation marks removed); *see also Brecht v. Abrahamson*, 507 U.S. 619, 635-37 (1993). Under *Brecht*, a federal court may overturn a state conviction "only when the constitutional violation 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Wood*, 644 F.3d at 93 (quoting *Brecht*, 507 U.S. at 637). To make this determination, "'we consider the importance of the wrongly admitted evidence, and the overall strength of the prosecution's case.'" *Id.* at 94 (quoting *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)) (brackets and ellipsis omitted). The strength of the prosecution's case without the erroneously admitted evidence "'is probably the single most critical factor in determining whether the error was harmless.'" *Id.* (quoting *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994)). We assess the importance of the wrongly admitted evidence by considering (1) the "prosecutor's conduct with respect to the evidence," (2) whether the evidence "bore on an issue plainly critical to the jury's decision," and (3) whether the evidence "was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." *Id.* (internal citations, quotation marks, and ellipses omitted).

The magistrate judge held that the admission of Jackson's statement to Bonisteel acknowledging the "possibility" that he might have been "so drunk that he couldn't remember raping [CJ]," Trial Tr. at 503-04, was not harmless with respect to the jury verdicts involving CJ. *See Jackson*, 765 F. Supp. 2d at 282-83. Absent Jackson's statements to

Bonisteel, the State's case consisted of CJ's testimony, the medical reports prepared at Rochester General Hospital the night of the incident, and the testimony of Karen and Rebecca. Of this evidence, only CJ's testimony directly implicated Jackson. Karen and Rebecca did not witness the sexual assault – they merely heard the voices of CJ and Jackson over the baby monitor. And while the two medical reports revealed that there was an "abrasion" or "irritation" on CJ's vaginal opening, the reports gave no indication of its cause. We therefore agree with the magistrate judge that the State's case on these counts was not "overwhelming."

Nonetheless, given this evidence, we would likely find the admission of Jackson's statements harmless were it not for two additional considerations – the lack of any physical evidence of CJ's sexual abuse and the damaging mischaracterization of Jackson's statements by the prosecutor in her summation. We have previously commented on the "particular importance of physical evidence in child sexual abuse cases," which often can turn into credibility contests. *See, e.g.*, *Eze v. Senkowski*, 321 F.3d 110, 128 (2d Cir. 2003). Here, despite the tests performed on CJ's sexual assault kit and the sheets recovered from Jackson's bed, on which CJ testified the sexual assault occurred, the State was unable to present any physical evidence at trial. Defense counsel used this lack of evidence in his summation, arguing that although CJ had testified that Jackson sexually abused her on three separate occasions, the State had not been able to present any DNA, blood, semen, or pubic hair corroborating her account. The lack of physical evidence and defense counsel's exploitation of the absence of such evidence provided the jury with a legitimate reason to question CJ's account of the sexual abuse. Thus, Jackson's inculpatory acknowledgement of the

"possibility" that he might have been so drunk that he could not remember raping CJ may well have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Beyond the absence of physical evidence, however, we are convinced that Jackson's statement influenced the jury because of the way the prosecutor mischaracterized that statement in her closing argument. The prosecutor asserted that, after Bonisteel "accused [Jackson] of having sex with [his] own child," he responded, "Yeah, maybe, I could have." App'x at 271. This inaccurate portrayal of Bonisteel's testimony completely reframed Jackson's statement in a way that made it appear much more damning. As noted above, Bonisteel's actual testimony was that, after Jackson denied hurting CJ, Bonisteel asked him whether "it was possible that he was so drunk that he couldn't remember raping [CJ]," to which Jackson responded that "it was a possibility." Trial Tr. at 503-04. The State argues that the first part of Jackson's statement to Bonisteel—his adamant denial that he had hurt CJ—was beneficial to the defense. Although defense counsel did rely upon Jackson's denials in his closing argument, the State fails to acknowledge the effect of the prosecutor's inflammatory mischaracterization of the latter portion of Jackson's statement into what became, in essence, an admission of the crime. The degree to which the prosecutor found it necessary to mischaracterize the latter portion of Jackson's statement is indicative of its centrality to the State's case. *Cf. Wood*, 644 F.3d at 98 (prosecutor's focus in summation on an erroneously admitted statement indicates that the statement was "central to the prosecution's case").

The State argues that Jackson's statement to Bonisteel contained "somewhat redundant information," comparable to that contained in his statement to Tony Arnold. *See* State Br. at 42-43. We are not persuaded as to the counts involving CJ because, unlike his statement to Bonisteel, Jackson never acknowledged to Arnold even the possibility that he had been so drunk he would not have remembered raping CJ. Instead, Jackson told Arnold that on the evening of November 29-30, 2000 he had sex with "both of his wives," who waited until he fell asleep and then called the police in an attempt to "charge him with raping his daughter." Tr. 549. Jackson's admission to Arnold that he had sex with "both of his wives" undoubtedly lessens the injurious impact that his statement to Bonisteel had on the charges involving Rebecca and Karen. It cannot be said, however, that Jackson's attempt to explain the charges involving CJ as stemming from his "wives'" false police report was cumulative of the most damaging portion of his inculpatory statement to Bonisteel.

"When a reviewing court has 'grave doubt about whether a trial error . . . had substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." *Wood*, 644 F.3d at 99 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)) (additional quotation marks omitted). Here, where the State's case involving CJ was not overwhelming, defense counsel exploited the lack of physical evidence, and the prosecutor mischaracterized Jackson's wrongly admitted inculpatory statement to make it more damaging, we conclude that the error was not harmless as to the counts involving CJ. We therefore affirm the magistrate judge's judgment granting habeas relief as to those counts.

Jackson argues that the erroneous admission of his statement caused a prejudicial spillover having an impact on the entire case and necessitating the vacatur of all the

41

convictions, not just those involving CJ. We consider three factors in evaluating the "spillover" effect of constitutional trial error that primarily effects only certain counts: "(1) whether the evidence on the vacated counts was inflammatory and likely to inflame the jury; (2) whether the evidence on the vacated counts was similar to that required to prove the remaining counts; and (3) the strength of the prosecution's case on the remaining counts." *Gersten v. Senkowski*, 426 F.3d 588, 614 (2d Cir. 2005) (citing *Lindstadt v. Keane*, 239 F.3d 191, 205 (2d Cir. 2001)). While the evidence against Jackson on the charges involving CJ was undeniably inflammatory because it related to allegations that he had raped and sodomized his fourteen-year-old daughter, we hold, based on the other two factors, that the effect of that evidence did not spill over to prejudice him on the remaining counts.

The strength of the prosecution's case on the counts involving Karen and Rebecca arising from the November 29-30, 2000 incident was stronger than its case for the counts involving CJ. Karen and Rebecca each witnessed Jackson sexually abusing the other and they both testified consistently about his actions that night. Moreover, as noted, Jackson admitted to Arnold that he had sex with "both of his wives" that evening, which provides additional corroboration.

All of the remaining counts involving Karen, Rebecca, and Jackson's son, GJ, relate to events occurring before the November 29-30, 2000 incident. Accordingly, the evidence of the statement the State used to prove Jackson sexually assaulted CJ that night was completely dissimilar to that needed to prove he committed these remaining counts. Under the circumstances presented here, Jackson's improperly admitted statements did not spill over and prejudice him as to the counts that did not involve CJ.

42

### III.    Prosecutorial Misconduct Claim

Jackson argued in his Fourth Department brief that three instances of prosecutorial misconduct deprived him of his constitutional right to a fair trial: the prosecutor's delayed disclosure of Tony Arnold as a State witness; her improper attempt to elicit expert testimony from Dr. Lenane; and her comments made during voir dire, her opening statement, and in summation.  The magistrate judge held that the Fourth Department's rejection of this claim on the ground that the prosecutor's comments "in her opening and closing statements were not so egregious as to deprive defendant of his right to a fair trial," *Jackson*, 772 N.Y.S.2d at 150 (citation, quotation marks, and brackets omitted), was an objectively unreasonable application of clearly established law, *see Jackson*, 765 F. Supp. 2d at 260.  On appeal, the State contends that the magistrate judge improperly considered an argument that Jackson failed to exhaust in the state courts and failed to afford the Fourth Department's decision the proper deference under AEDPA.

#### A.    Exhaustion

The magistrate judge found that Jackson's prosecutorial misconduct claim warranted habeas relief based, in part, on the prosecutor's violation of the trial court's prior bad act evidentiary ruling.  *See Jackson*, 765 F. Supp. 2d at 257-58.  We agree with the State that the magistrate judges should not have considered this aspect of Jackson's claim because he did not present this issue to the Fourth Department as part of his prosecutorial misconduct claim.  Although Jackson raised in the Fourth Department a separate claim based on the trial court's failure to adhere to its prior bad act ruling, he did not include the prosecutor's elicitation of the prior bad acts as an example of her prosecutorial misconduct.  This portion

43

of the prosecutorial misconduct claim is therefore unexhausted. *See Rosa*, 396 F.3d at 217.

Jackson has no further state avenues in which to press this issue because he has completed

his direct appeal and the nature of the claim is apparent from the face of the record, meaning

that he would be barred from raising it in a motion to vacate the judgment. *See* N.Y. Crim.

Proc. Law § 440.10(2)(c) (stating that the court "must deny" a § 440.10 motion when

sufficient facts appear on the record to permit appellate review of the claim and the

defendant unjustifiably failed to raise that issue on direct appeal); *see also Sweet v. Bennett*, 353

F.3d 135, 140 (2d Cir. 2003) (applying section 440.10(2)(c) to claims raised for the first time

in federal habeas petition). For these reasons, we deem this issue exhausted but procedurally

defaulted, *see Sweet*, 353 F.3d at 140, and do not consider it when assessing the prosecutorial

misconduct claim.[27]

> B.    *Clearly Established Law*

As noted, the Fourth Department adjudicated Jackson's prosecutorial misconduct

claim on the merits. *See Jackson*, 772 N.Y.S.2d at 150. As such, we must first identify the

clearly established Supreme Court principles governing his claim. The district court

identified four relevant Supreme Court decisions: *Berger v. United States*, 295 U.S. 78 (1935),

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), *United States v. Young*, 470 U.S. 1 (1985), and

---

[27] Jackson has not argued on appeal that his procedural default should be excused pursuant to one of the exceptions to that doctrine and we therefore do not consider this issue. *See, e.g., Clark*, 510 F.3d at 382 ("'Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent.'" (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998))).

*Darden v. Wainwright*, 477 U.S 168 (1986). The parties do not dispute this list. We consider each potential authority in turn.

    1.    *DeChristoforo* and *Darden*

*DeChristoforo* and *Darden* involved habeas petitions brought by state prisoners who argued that statements made by prosecutors in closing argument deprived them of their Fourteenth Amendment right to a fair trial.[28] *See Darden*, 477 U.S. at 170; *DeChristoforo*, 416 U.S. at 638. These cases state the rule—first laid by *DeChristoforo* and then cemented by *Darden*—that the relevant question when addressing such claims is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 180 (quoting *DeChristoforo*, 416 U.S. at 643). The Supreme Court has recognized this rule as "clearly established" law for purposes of AEDPA. *See Matthews*, 132 S. Ct. at 2153.

    2.    *Berger* and *Young*

In *Berger*, the Supreme Court ordered a new trial when the evidence supporting the defendant's conspiracy conviction was "weak" and the record clearly demonstrated the prosecutor's "pronounced and persistent" misconduct throughout trial and during

---

[28] In *DeChristoforo*, the prosecutor commented on the defendant's motive for standing trial, stating that the defendant had done so in the hope that the jury would find the defendant guilty of a lesser charge, rather than acquit him. 416 U.S. at 640. In *Darden*, the prosecutor referred to the defendant as an "animal," implied that the death penalty was the only guarantee against future harm to the public, and remarked, *inter alia*, that he wished the defendant had killed himself and that he would like to see the defendant's face "blown away by a shotgun." 477 U.S. at 180 & n.12.

summation.[29]  295 U.S. at 88-89.  In ordering a new trial, the Court held that the

prosecution's interest in a criminal case "is not that it shall win [the] case, but that justice

should be done" and, therefore, "[i]t is as much [a prosecutor's] duty to refrain from

improper methods calculated to produce a wrongful conviction as it is to use every

legitimate means to bring about a just one."  *Id.* at 88.

*Young* involved a prosecutor's improper comments during summation made in

response to defense counsel's equally improper remarks.  470 U.S. at 4-6.  Specifically, the

prosecutor expressed his personal view of the defendant's guilt and his belief that the

defendant had not acted with "honor and integrity."  *See id.*  The Court held that the decision

on whether the prosecutor's comments seriously affected the fairness or integrity of the trial

was to be made by assessing those comments within the context of the record as a whole,

including the improper statements made by defense counsel that had invited the prosecutor's

response.[30]  *See id.* at 11, 16-17.  Applying this standard, the Court held that while the

prosecutor's statements were "inappropriate and amounting to error," they "were not such

as to undermine the fundamental fairness of the trial" given the nature of defense counsel's

---

[29] Among other improprieties during trial, the *Berger* prosecutor was "guilty of misstating the facts in his cross-examination of witnesses; . . . of pretending to understand that a witness had said something he had not said and persistently cross-examining the witness on that basis; of assuming prejudicial facts not in evidence; [and] of bullying and arguing with witnesses."  *Berger*, 295 U.S. at 84.  In addition, the prosecutor's summation "was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury."  *Id.* at 85.

[30] Because the defense did not object to the prosecutor's comments, the issue in *Young* was not whether the prosecutor's comments were erroneous, but rather whether they constituted "plain error" in that they seriously affected the fairness or integrity of the entire trial.  *See id.* at 6-7, 14-16.

comments, the fact that the prosecutor had not implied that he had evidence of the

defendant's guilt unknown to the jury, and the overall strength of the prosecution's case. *Id.*

at 16-20.

It is important to note that neither *Berger* nor *Young* expressed its holding in

constitutional terms. We are convinced, however, that we may consider these holdings in

this case because later Supreme Court cases incorporated them into the Court's Fourteenth

Amendment prosecutorial misconduct jurisprudence. *See United States v. Agurs*, 427 U.S. 97,

107, 110-11 (1976) (explaining that *Berger*'s description of the prosecutor's duty "illuminates"

the standard governing "his obligation to disclose exculpatory evidence" under the Due

Process Clauses of the Fifth and Fourteenth Amendments); *Darden*, 477 U.S. at 182

(invoking *Young*'s holding to conclude that the prosecutor's statements in response to

defense counsel's arguments did not deprive the habeas petitioner of a fair trial); *see also*

*Banks v. Dretke*, 540 U.S. 668, 694 (2004) (citing *Berger* for the proposition that it was

"appropriate for [the habeas petitioner] to assume that his prosecutors would not stoop to

improper litigation conduct to advance prospects for gaining a conviction"); *Kyles v. Whitley*,

514 U.S. 419, 439-40 (1995) (citing *Berger* when discussing the prosecutor's obligation to

disclose exculpatory evidence).[31]

---

[31] In *Cone v. Bell*, the Court, quoting *Agurs* and *Berger*, expressly stated that "[t]he right to a fair trial, guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment, imposes on the States certain duties consistent with their sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." 556 U.S. 449 (2009) (quoting *Agurs*, 427 U.S. at 111 (quoting, in turn, *Berger*, 295 U.S. at 88)). *Cone*, however, was not decided until 2009, some five years after the Fourth Department considered Jackson's case and therefore it cannot be considered as a source of "clearly

Consideration of the four above holdings leaves us with the following principles, which we now hold to be "clearly established" law governing prosecutorial misconduct claims such as Jackson's.[32]  First, on federal habeas review, the relevant standard is "'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Darden*, 477 U.S. at 180 (quoting *DeChristoforo*, 416 U.S. at 642).  Thus, while the State has a "duty to refrain from improper methods calculated to produce a wrongful conviction," *Berger*, 295 U.S. at 88, such methods will warrant habeas relief only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" *Darden*, 477 U.S. at 180 (quoting *DeChristoforo*, 416 U.S. at 643).  The habeas court must consider the record as a whole when making this determination, because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context.  *See Young*, 470 U.S. at 16-17; *Darden*, 477 U.S at 182 (applying *Young*); *see also DeChristoforo*, 416 F.3d at 647-48 (distinguishing between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process").  When reviewing such claims under the "unreasonable application prong" of § 2254(d)(1), the habeas court must keep in mind that this standard is

---

established" law.  *See Andrade*, 538 U.S. at 71-72.  Nonetheless, the statement in *Cone* bolsters our conclusion that *Agurs* incorporated *Berger*'s holding into the Court's Fourteenth Amendment jurisprudence.

[32] We note that separate principles, not implicated here, govern a prosecutor's duty to disclose exculpatory evidence, *see generally Brady v. Maryland*, 373 U.S. 83 (1963), and claims of prosecutorial misconduct implicating a defendant's specific rights, such as the right to be free from compelled self-incrimination, *see DeChristoforo*, 416 U.S. at 643 (citing *Griffin v. California*, 380 U.S. 609 (1965)).

a "very general one" that affords courts "leeway in reaching outcomes in case-by-case

determinations." *Matthews*, 132 S. Ct. at 2155 (quotation marks and ellipses omitted).[33]

    C.    *Application*

While we echo the magistrate judge's opprobrium for several of the methods used by

the prosecutor in Jackson's case and may well have reached a different outcome were this

case before us on direct appeal, we must reverse for the reasons set forth below.

The Fourth Department's decision referenced only the prosecutor's comments made

in her opening and closing statements and did not specifically address her delayed disclosure

---

[33] Jackson urges us to employ the test set forth in *Tankleff v. Senkowski*, on which the district court relied to grant relief on the prosecutorial misconduct claim. *See Jackson*, 765 F. Supp. 2d at 254. In that pre-AEDPA case, we set forth the *Darden* rule and then explained, citing to a case discussing the harmless error standard applicable to certain claims on habeas review, that the successful habeas petitioner must demonstrate he suffered "'actual prejudice'" because the prosecutor's improper comments "'had a substantial and injurious effect or influence in determining the jury's verdict.'" *See Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (discussing the harmless error standard set forth in *Brecht*, 507 U.S. at 619)). We then set forth a three-part test for determining whether the petitioner suffered actual prejudice: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the" misconduct. *Id.* at 252 (quotation omitted). While the *Tankleff* test ostensibly addresses the harmless error issue in the context of a prosecutorial misconduct claim brought under § 2254, we have used an identical test in connection with prosecutorial misconduct claims brought on direct appeal. *See, e.g.*, *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002). Indeed, the *Tankleff* test appears to have its roots in *United States v. Modica*, our decision on a direct appeal that pre-dated *Darden* and cited a law review article for the proposition. *See* 633 F.2d 1173, 1181 (2d Cir. 1981); *see also Tankleff*, 135 F.3d at 252 (citing *Modica*).

    Given its history, we cannot say that the *Tankleff* test simply reflects what the Supreme Court has "clearly established" in its prior cases, and we decline to rely on it here given the Court's recent reversal of the Sixth Circuit for employing its somewhat similar test to determine whether a prosecutorial misconduct claim warranted relief under § 2254(d)(1). *See Matthews*, 132 S. Ct. at 2155 (explaining that the Sixth Circuit's "elaborate, multistep test" bore "scant resemblance" to *Darden*'s "highly generalized standard").

of Arnold as a witness or her attempt to elicit expert testimony from Dr. Lenane.  *See Jackson*, 772 N.Y.S.2d at 150.  Because the Fourth Department did not supply its reasoning as to these issues, our task is to identify the "'arguments or theories [that] could have supported'" its decision, and then inquire "'whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.'"  *Hawthorne v. Schneiderman*, 695 F.3d 192, 196 (2d Cir. 2012) (brackets omitted) (quoting *Richter*, 131 S. Ct. at 786).  Here, the magistrate judge properly identified arguments that could have supported the Fourth Department's rejection of these issues.  He failed, however, to afford those arguments the proper AEDPA deference.

As the magistrate judge observed, the prosecutor notified the defense that Arnold would be a witness approximately one week after the Monroe Public Safety Laboratory issued its March 27, 2001 report in which it excluded CJ as the source of the DNA found on the fitted sheet recovered from Jackson's bed.  Jackson made this same observation in his brief submitted to the Fourth Department.  Faced with this chronology, the magistrate judge found it "conceivable that the prosecutor might not have been intending to call Arnold up until she received the results of the bloodstain testing."  *Jackson*, 765 F. Supp. 2d at 255.  The Fourth Department also could have arrived at this innocuous theory for the delayed disclosure, which eliminates any stigma of improper conduct, especially given that New York's Criminal Procedure law "does not compel the production of witness lists except when a defendant asserts an alibi defense."  *People v. Williams*, 664 N.Y.S.2d 835, 837 (App. Div. 1st Dep't 1997) (citing N.Y. Crim. Proc. Law § 250.20).

50

The magistrate judge went on to find, however, that the prosecutor unethically withheld identifying Arnold to the defense in order to force a last-minute change in counsel and thus gain a tactical advantage by affording new counsel only one month to prepare. *See Jackson*, 765 F. Supp. 2d at 255-56. Even if we were to agree with the magistrate judge's characterization of the prosecutor's motives (which is unsupported by the record), we would not find that her actions alone ultimately undermined the fairness of the proceedings. It was newly-appointed defense counsel, not the prosecutor, who informed the court that he needed only one month to prepare for trial and who suggested the ultimate trial date. *See* App'x at 188-90. There is no indication that the trial court would not have given defense counsel more time if asked; to the contrary, the court initially suggested holding the trial some three weeks after the date proffered by defense counsel. *See id.* at 189-90. Thus, any unpreparedness by defense counsel, and any concomitant unfairness Jackson suffered as a result, was as attributable to defense counsel as to the prosecutor, whatever her motivation. For that reason, even assuming the prosecutor's improper motivation, her conduct did not deprive Jackson of due process.

If the record is ambiguous as to the prosecutor's motive for delaying the disclosure of Arnold as a witness, it is all too clear about her improper attempt to elicit expert testimony from Dr. Lenane. Not only did the prosecutor breach her pretrial representation to defense counsel that the State would not call an expert at trial, she also failed to correct the trial court's incorrect assumption that Dr. Lenane was a "treating physician," a misapprehension that was the basis for the court allowing the doctor to testify. *See* App'x at 205-08. We discern from the record no possible explanation for this behavior other than an attempt to

51

obtain an unfair advantage at trial and, like the magistrate judge, we find the prosecutor's "lack of professional candor . . . inexcusable." *Jackson*, 765 F. Supp. 2d at 257.

Nevertheless, our task is not to determine whether this behavior was inappropriate, unethical, or even erroneous. Instead, the sole issue before us is whether it was objectively unreasonable for the Fourth Department to find that the behavior did not "so infect[] the trial with unfairness" that it deprived Jackson of due process. *Darden*, 477 U.S. at 180 (quotation marks omitted). In light of the trial court's curative instruction, we cannot so conclude.

In his brief, Jackson identifies Dr. Lenane's statement that the "abrasion" noted in CJ's medical reports was "consistent with penetration" as the most damaging part of her testimony. Jackson Br. at 19-20. Immediately after it became apparent that Dr. Lenane was not a treating physician, the trial court sustained defense counsel's objection and, after some discussion with counsel, directed the jury to disregard the "entirety" of her testimony because the State had improperly called her as an expert witness without first providing notice to the defense. *See* App'x at 228-29. We "presume that a jury will follow an instruction to disregard inadmissible evidence . . . unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (internal citations and quotation marks omitted); *see also United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (same). For several reasons, we believe that this standard has not been met in this case.

While the magistrate judge characterized the trial court's initial curative instruction as "tepid," *Jackson*, 765 F. Supp. 2d at 257, the court reminded the jurors in its jury charge that they "certainly" should not consider any stricken testimony, *see* Tr. at 670. By reinforcing its initial curative instruction immediately before the jury began its deliberations, the trial court thus reduced the probability that the jury would improperly rely on Dr. Lenane's stricken testimony when reaching a verdict.

Even if there was an "overwhelming probability" that the jury was unable to follow the trial court's instructions, Jackson cannot demonstrate a "strong likelihood" that Dr. Lenane's testimony was "devastating" because the most damaging portion of that testimony was equivocal. When first asked whether the abrasion noted on CJ's medical record was consistent with penetration, Dr. Lenane stated that the abrasion was "consistent with some type of trauma" that "could include penetration, but . . . wouldn't necessarily have to." *See* App'x at 212. It was only after the prosecutor asked the question a second time that Dr. Lenane answered affirmatively. *Id.* In short, we find that the prosecutor's improper introduction of Dr. Lenane's testimony did not violate Jackson's right to a fair trial given the trial court's immediate curative instruction, its later reinforcement of that instruction, and the equivocal nature of her most damaging statement. *Cf. Miller*, 483 U.S. at 766 ("The sequence of events in this case – a single question, an immediate objection, and two curative instructions – clearly indicates that the prosecutor's improper question did not violate Miller's due process rights." (footnote omitted)).

Turning to the prosecutor's opening and closing statements, we first note that certain comments flagged as inappropriate by the magistrate judge were supported by the trial

53

evidence. Both Karen and Rebecca related to the jury numerous examples of Jackson's

domineering personality and the extensive physical and sexual abuse they suffered at his

hands over the years. *See, e.g.*, Tr. at 242, 247-52, 350-56. We thus find nothing improper

with the prosecutor's remark in her opening statement that the victims' testimony would

expose Jackson as a "controlling" man who "abused them constantly," App'x at 194, and her

comment in summation that Jackson had "consistently abused his family for years," *id.* at

281. In addition, the prosecutor's characterization of Jackson in her opening statement as

"twisted" and "sadistic" was no more inflammatory than the statements made by the

prosecutor in *Darden*, which the Court found did not warrant habeas relief. *See* 477 U.S. at

180 & n.12 (prosecutor referred to the defendant as an "animal" and remarked, *inter alia*, that

he would like to see the defendant's face "blown away by a shotgun"); *see also Matthews*, 132

S. Ct. at 2155.

The prosecutor's other statements made in her summation are somewhat more

troubling. In addition to referring to Jackson's guilt a number of times, the prosecutor

ostensibly vouched for the victims' credibility when she stated that "[e]ven the best actor or

actress could probably not tremble with fear as continuously as some of these witnesses

did." App'x at 259.[34] Unlike a direct appeal from a conviction, we need not decide

---

[34] The magistrate judge also apparently faulted the prosecutor for her assertion that all of the victims testified consistently with the others, thus proving that their testimony was not part of a plan to frame Jackson. *See Jackson*, 765 F. Supp. 2d at 258. We, however, can discern no precedent of the Supreme Court that prohibits prosecutors from commenting on witnesses' consistent testimony. *Cf. Matthews*, 132 S. Ct. at 2154 (noting that the Sixth Circuit "cited no precedent of th[e Supreme] Court in support of its conclusion that due process prohibits a

conclusively whether these statements were improper. In this challenge to the district court's determination of a § 2254 petition, it is sufficient that we hold fairminded jurists could disagree as to the correctness of the Fourth Department's conclusion that the statements were not "so egregious" as to deprive Jackson of his right to a fair trial.[35] *See Richter*, 131 S. Ct. at 786.

We first observe that the prosecutor's remarks were not explicitly couched in terms of her personal opinion, which reduces the probability that the jury adopted the opinion of the State (expressed through the prosecutor) in lieu of its own independent assessment of the evidence. *Compare* App'x at 274 ("that man [(referring to Jackson)] sitting there . . . is guilty), *id.* at 275 (positing that the only "possible explanation" for the victims' testimony was that "it is true and he is guilty"), *and id.* at 281 (stating that Jackson "is guilty of everything"), *with Young*, 470 U.S. at 5 ("*I think* [the defendant intended to defraud the victim]." (emphasis added)). Moreover, none of the prosecutor's comments implied that she had evidence of Jackson's guilt beyond that presented to the jury. *Contra Berger*, 295 U.S. at 86-87 (after a witness had difficulty identifying the defendant, the prosecutor stated in summation that "you can bet your bottom dollar [the witness] knew Berger" but that he had been prevented

---

prosecutor from emphasizing a criminal defendant's motive to exaggerate exculpatory facts").

[35] Two dangers arise when a prosecutor vouches for the credibility of witnesses and expresses her "personal opinion" as to the defendant's guilt: (1) "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges"; and (2) given that "the prosecution's opinion carries with it the imprimatur of the [g]overnment," the jury may be induced "to trust the [g]overnment's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19 (citing *Berger*, 295 U.S. at 88-89).

from eliciting that information at trial due to certain procedural rules (emphasis removed)).

Finally, in its jury charge, the trial court explicitly reminded the jury that statements made by

the attorneys in summation were not evidence and that the jurors were to draw their own

conclusions from the facts, rather than rely on those supplied by counsel, *see* App'x 285-86,

thus further reducing the potential for prejudice. *Cf. DeChristoforo*, 416 U.S. at 644 (noting

the trial court's "special pains to correct any impression that the jury could consider the

prosecutor's statements as evidence in the case"). Given all of the above, and recognizing

that the general *Darden* standard affords the state courts "leeway" in its application, *see*

*Matthews*, 132 S. Ct. at 2155, we reverse the district court's grant of habeas relief on Jackson's

prosecutorial misconduct claim.[36]

## IV.    Ineffective Assistance of Counsel Claim

### A.    Procedural Considerations

Before reaching the merits of Jackson's ineffective assistance claim, we address three

procedural considerations. First, the district court found certain aspects of this claim

unexhausted due to Jackson's failure to present those issues to the state courts, a conclusion

---

[36] The prosecutor's blatant mischaracterization of Bonisteel's testimony may have been the proverbial straw that broke the camel's back, at least with respect to the charges involving CJ. As noted above, Bonisteel related to the jury Jackson's acknowledgment that it was "possible that [he] was so drunk that [he] couldn't remember raping [CJ]." Trial Tr. at 503-04. In summation, the prosecutor completely reframed this testimony, asserting that, when Jackson was "accused of having sex with [his] own child," he stated, "Yeah, maybe, I could have." App'x at 271. While we find this mischaracterization extremely inappropriate, we need not assess its impact as part of the overall prosecutorial misconduct claim because Bonisteel's testimony on this point relates only to those charges involving CJ. As we held above, those charges must be vacated due to the improper admission of Bonisteel's testimony in the first place.

Jackson challenges on appeal. Second, the State argues that we are barred from considering the entire claim because the trial court denied Jackson's § 440.10 motion on the procedural ground that he could have raised his ineffective assistance claim on direct appeal. Third, the State argues that, in contravention of the Supreme Court's *Pinholster* decision, the district court improperly relied on evidence that was not before the state courts. We address each argument in turn.

The magistrate judge's determination that Jackson failed to exhaust Points One and Two of his ineffective assistance claim need not delay us long. *See Jackson*, 765 F. Supp. 2d at 260-61. In these Points, Jackson argued that (1) defense counsel's lack of preparation was "painfully exposed" by his incorrect assumption that the State was required to prove penetration in order to sustain the first-degree sodomy convictions, and (2) counsel "failed to correctly marshal an investigation into the plethora of exculpatory evidence (physical, medical, forensic, visual, tactile, [etc.])" and then failed to introduce this evidence at trial. App'x at 15-16 (capitalization removed). As Jackson argues on appeal, he clearly presented these same arguments in his brief submitted to the Fourth Department, *see id.* at 107 (defense counsel failed to offer evidence "despite the existence of substantial medical evidence . . . not used by the prosecution"), 108 (arguing that defense counsel "fail[ed] to utilize the plethora of indisputable scientific evidence"), 109 (defense counsel "fail[ed] to investigate medical claims"), 111 (defense counsel's lack of preparedness shown by his failure "even to investigate so basic an item as the elements of the crimes"), and raised the same arguments in his application for leave to appeal to the New York Court of Appeals, *see id.* at 294-331. Accordingly, Jackson fully exhausted these issues by presenting them to the "highest state

court capable of reviewing" them, *Rosa*, 396 F.3d at 217, and the magistrate judge's

conclusion to the contrary was erroneous.

Although the State does not dispute Jackson's exhaustion argument, it maintains that

the entirety of Jackson's ineffective assistance claim is barred by the trial court's November

2003 rejection of Jackson's § 440.10 motion on the procedural ground that his claim could

be raised in his then-pending direct appeal. *See* App'x at 29-30 (citing N.Y. Crim. Proc. Law

§ 440.10(2)(b)).[37] We are puzzled by this argument, as it completely ignores the fact that

Jackson did, in fact, raise the same ineffective assistance arguments on direct appeal, going

so far as to include his § 440.10 motion in the record he submitted to the Fourth

Department. *See id.* at 107. Moreover, while the State argued before the Fourth Department

that Jackson's ineffective assistance claim was barred because it was "based on factual

assertions outside the record" and therefore could only be raised in a § 440.10 motion, *see id.*

at 128, the Fourth Department did not reject Jackson's claim on this ground. Instead, the

Fourth Department rejected the claim on the merits, holding that Jackson was "not entitled

to error-free representation" and had "failed to demonstrate the absence of strategic or other

legitimate explanations for counsel's alleged failures." *Jackson*, 772 N.Y.S.2d at 150 (citations

and quotation marks omitted). Thus, the State's reliance on the procedural default doctrine

is misplaced because that doctrine bars federal review "only when the last state court

rendering a judgment in the case clearly and expressly states that its judgment rests on a state

---

[37] N.Y. Crim. Proc. Law § 440.10(2)(b) provides that the trial court "must deny a motion to vacate a judgment" when "[t]he judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such appeal."

procedural bar." *Messiah*, 435 F.3d at 195 (quotation marks omitted); *see also Richter*, 131 S.

Ct. at 784-85 ("When a federal claim has been presented to a state court and the state court

has denied relief, it may be presumed that the state court adjudicated the claim on the merits

in the absence of any indication or state-law procedural principles to the contrary.").

As a final procedural point, the State argues that, when conducting our *de novo* review

of Jackson's ineffectiveness claim, we should disregard the evidence presented to the district

court during its evidentiary hearing, and "limit [our] review to the records before the state

courts." State Br. at 15-16 (citing *Pinholster*, 131 S. Ct. at 1392, 1401). Jackson argues that

the evidentiary hearing was proper because he demonstrated, on the basis of the state court

record alone, that the state courts' rejection of his ineffective assistance claim was

unreasonable, and the evidentiary hearing "merely confirms what [he] alleged in the state

court pleadings – that there could be no strategic basis for counsel's failings." Jackson Br. at

49-52.

Because Jackson's claim was adjudicated by the Fourth Department on the merits, we

agree with the State that Jackson "must overcome the limitation of § 2254(d)(1) on the

record that was before that state court." *Pinholster*, 131 S. Ct. at 1400. In cases such as this,

where a district court relies on extra-state court record facts to grant habeas relief, *see, e.g.*,

*Jackson*, 765 F. Supp. 2d at 263-64, we "might ordinarily remand for a properly limited

review," *Pinholster*, 131 S. Ct. at 1401.[38] However, because Jackson argues on appeal that he

---

[38] We note that, at the time the magistrate judge issued his decision in February 2011, *Pinholster* had yet to be decided.

was entitled to relief on the state court record alone, we opt not to remand in this case but instead conduct our *de novo* review without "relying on evidence beyond the state court record to reach our result." *Young*, 715 F.3d at 82 (Parker, J., concurring in the denial of rehearing *en banc*). Based on this more limited review, we conclude that Jackson is not entitled to relief.[39]

> B.    *Clearly Established Law*

The clearly established law applicable to Jackson's ineffective assistance claim is the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* standard is twofold. To succeed, Jackson "must (1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011). When considering the first prong, we "'strongly presume[] [that counsel] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690), a presumption that is overcome only through a showing that "counsel failed to act 'reasonably considering all of the circumstances,'" *id.* (quoting

---

[39] Given this conclusion, we need not address whether a district court that determines, on the state court record alone, that a state court's denial of a claim was objectively unreasonable, may then hold an evidentiary hearing to determine whether it may "grant the relief [the petitioner] requests." *See Rossum v. Patrick*, 659 F.3d 722, 736 (9th Cir. 2011) (Gertner, J., sitting by designation, dissenting); *see also Pinholster*, 131 S. Ct. at 1412 (Breyer, J., concurring in part and dissenting in part) (suggesting that if the "the state-court rejection [of a claim] assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated)," then, after finding the state court wrong on one of the grounds in § 2254(d), "an [evidentiary hearing] might be needed to determine whether the facts alleged were indeed true"(emphasis in original)).

*Strickland*, 466 U.S. at 690) (brackets omitted).  To establish prejudice under the second prong, Jackson "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome," *id.*, which "requires a 'substantial,' not just 'conceivable,' likelihood of a different result."  *Pinholster*, 131 S. Ct. at 1403 (quoting *Richter*, 131 S. Ct. at 791).

When evaluating an ineffective assistance claim under § 2254(d), our review is "doubly deferential" in that "[w]e take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)."  *Pinholster*, 131 S. Ct. at 1403 (citations and quotation marks omitted).  Like the *Darden* standard discussed above, the *Strickland* standard is general, meaning that the habeas court must afford the state courts "more latitude to reasonably determine that a defendant has not satisfied th[e] standard."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

C.    *Application*

The Fourth Department denied Jackson's ineffective assistance claim on the ground that he "failed to demonstrate the absence of strategic or other legitimate explanations for counsel's alleged failures."  *Jackson*, 772 N.Y.S.2d at 150 (citations and quotation marks omitted).  Jackson argues that this conclusion was unreasonable and organizes his claim into three subparts: (1) counsel's failure to consult with or call an expert; (2) his failure to introduce at trial the "exculpatory" laboratory and DNA test results; and (3) his failure to

61

investigate adequately the exculpatory evidence and the elements of first-degree sodomy. *See* Jackson Br. at 54-66. We analyze each contention in turn.

    1.     <u>Failure to Consult with an Expert</u>

Jackson argues that defense counsel's failure to consult with an expert prior to trial left him unable to (1) "develop and implement an effective means for communicating to the jury the lack of [medical] evidence of inflicted trauma," or (2) "effectively counter the impact" of Dr. Lenane's testimony. *See* Jackson Br. at 54-55. When assessing counsel's performance under *Strickland*, we must endeavor to "'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bierenbaum v. Graham*, 607 F.3d 36, 50-51 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 689). In this case, defense counsel's decision not to consult with or call an expert must be evaluated in light of one significant fact: he was operating under the assumption, confirmed by the State's written representation, that the State would not call a medical expert at trial.

This crucial fact distinguishes this case from those cited by Jackson, in which we have held that, "because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel" in sexual assault cases. *Gersten*, 426 F.3d at 607 (citing *Eze*, 321 F.3d at 127-28); *see also id.* at 608 ("The prosecution's case rested centrally on the alleged victim's testimony and its corroboration by the indirect physical evidence *as interpreted by the medical expert*." (emphasis added)); *Lindstadt*, 239 F.3d at 201-02 (defense counsel's failure to consult with medical expert left him unprepared to cross-examine the State's medical expert). From defense counsel's perspective in this case,

he and the State would be on the same footing at trial—neither would have access to an expert and both would have to rely only on the bare medical records. Given this perspective, counsel could have refrained from calling a medical expert for a valid strategic reason: fear of the concessions the State may have been able to extract from that expert on cross-examination. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002) ("[W]hen a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (citation and quotation marks omitted)).

Moreover, the State's pretrial representation is not only relevant to counsel's decision not to call an expert at trial but also informs the reasonableness of his consultation with medical personnel before trial. This is not a case where counsel completely failed to conduct a pretrial consultation. *Contra Pavel v. Hollins*, 261 F.3d 210, 216-18, 224-25 (2d Cir. 2001) (counsel opted not to prepare a defense, including consulting with medical personnel, "solely" because he believed the trial court would grant his motion to dismiss). Instead, as defense counsel informed the trial court, he reviewed the relevant medical records with a registered nurse. *See* App'x at 226-27. While such a consultation may not have been sufficient if the State had been preparing to call a medical expert at trial, *cf. Gersten*, 426 F.3d at 604-05, 607-11 (defense counsel's pretrial consultation with a nurse not sufficient where state presented at trial extensive medical and psychological expert testimony), we cannot say, in the circumstances of this case, that counsel's decision was unreasonable. More important,

63

even if we found counsel's performance deficient on this point, the above considerations

illustrate that the Fourth Department's decision was not objectively unreasonable.

> 2.     Failure to Introduce Laboratory Reports and DNA Tests

We agree with the magistrate judge that defense counsel's decision not to introduce

the laboratory reports and DNA tests did not rise to the level of ineffective assistance. *See*

*Jackson*, 765 F. Supp. 2d at 269-70. Our independent review of those reports confirms the

magistrate judge's conclusion that, while they may have been helpful to the defense, they

"did not have [any] exceptional value" in light of the victims' testimony that Jackson was

unable to maintain an erection. *See id.* at 270. We also agree that, if these reports had

contained evidence beneficial to the State, it certainly would have introduced them at trial,

and its failure to do so allowed defense counsel to "take advantage of the negative reports

even though he did not introduce the reports themselves." *Id.* Accordingly, Jackson is not

entitled to relief on this aspect of his ineffective assistance claim.

> 3.     Failure to Investigate the Evidence or the Elements of Sodomy Counts

Jackson argues that defense counsel's failure to investigate adequately the

"exculpatory evidence" and the elements of the sodomy counts constituted ineffective

assistance. *See* Jackson Br. at 57-61. The only "exculpatory evidence" he identifies are the

laboratory and DNA reports which, as we set forth above, would not have had "exceptional

value" had they been presented at trial. Accordingly, even assuming that defense counsel

failed to mount an adequate investigation of the reports, Jackson cannot demonstrate that he

suffered prejudice as a result. Similarly, while defense counsel's failure to research the

elements of first-degree sodomy under New York law undoubtedly constitutes deficient

64

performance, the only prejudice Jackson identifies as flowing from this deficiency is counsel's decision not to introduce the laboratory reports, *see* Jackson Br. at 60-61, which is insufficient to warrant relief for the reasons already stated.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court insofar as it: (1) granted Jackson habeas relief on his *Miranda* claim as to the counts of conviction involving CJ; and (2) denied Jackson's ineffective assistance of counsel claims premised on counsel's failure to conduct an adequate pretrial investigation and introduce the laboratory reports and DNA tests at trial. We reverse in all other respects.